Please the court. In federal habeas, Witherspoon Witt claims are reviewed under a doubly deferential standard that requires their denial if there is any arguable basis in the state court record to support a finding of substantial impairment. In turn, to find substantial impairment, it is enough that the trial judge simply have a definite impression that the particular and that finding need not be proven with unmistakable clarity. Concerning Matthew Stringer, the veneer member upon which the court below granted federal habeas relief, five bases either individually or cumulatively support the Court of Criminal Appeals' affirmance of his excusal, and four bases support Patricia Cruz's excusal, an excusal that the lower court did not even think debatable amongst jurists of reason. The shared bases for these veneer members are, one, their questionnaires, two, the trial judge's observation of their demeanor, three, the actions of defense counsel, and four, their affirmative answers to the death qualification question. Let me ask you on the questionnaire issue. Your opponent says, well, the trial judge didn't even look at the questionnaire. Whose burden would it be to show, is it your burden to show the trial judge had the questionnaire or their burden to show that she didn't? It is their burden under 2254 D, Your Honor, that they show she did not. And in fact, I believe that it is an implicit determination by the CCA that the trial judge did have the questionnaires. I also believe that the record supports that the trial judge was looking at the questionnaires, Your Honor. Specifically. Now, I'm aware of what y'all pointed to, but I'm just wondering, like, do we even get there? Because, you know, I've certainly seen lawyers say, well, I don't even think the judge read what I filed. Well, okay, I mean, you never are really going to prove what the judge sitting in his or her chambers is doing, whether they've actually read your brief, they've read the record, whatever, whatever. But we don't make rulings based on that and go, wow, to rule this way, she must not have read the brief. We don't rule that way, because as long as the brief was there, we have to assume the judge read it, absent showing something that they didn't. Right? So does that, and that would be, like, on direct appeal, but here in the 2254 context, isn't that the assumption we need to make, absent of showing that in this particular county, they don't give the questionnaire to the judge or something like that? I fully agree with that, Your Honor. And indeed, if the Court were to turn its attention to United States v. Snar, which is a direct review case concerning Witherspoon Witt, there is a mention of what was in the questionnaire being different than what was there, and there is no mention in that record, at least from the review of the opinion, that the trial judge had either considered them or not considered them. Let me ask you something that wasn't raised in y'all's brief that I just want to know if this should come up while we're conferring on the case. You know, the Supreme Court is considering Madison v. Alabama, which has to do with somebody who doesn't remember why he's being executed. I realize that's not the situation we have here. It's a more extreme situation. But if the Supreme Court were to rule for the defendant in that case, tell me how you would argue it does or doesn't impact this case. I presume that is under the Eighth Amendment claim that they have raised, Your Honor. I think in this particular case, because there's already been a ruling on whether the Eighth Amendment would have the imposition of the death penalty of the mentally ill, 2254d confines this court's review to that particular decision. Any opinion that comes out from the Supreme Court after that was decided in state habeas in this case cannot be considered. So you would rely on Shoup for that proposition that Shoup was the one that said we can't look at Morvie, Texas in reviewing a state habeas because it came out after that? Yes, Your Honor. So you would analyze it that way? Yes, Your Honor. We wouldn't even have to get into, well, does this really cover our situation or not? Correct, Your Honor. It's the Supreme Court precedent that is in existence at the time of the relevant state court decision. It seems to me that's plainly contrary to decisions that distinguish between some error or change in the law and U.S. Supreme Court decisions that make certain people categorically ineligible for the death penalty. I thought they made that clear. I think that that, Your Honor, would be relevant to the Teague analysis, but not relevant to the 2254d analysis. 2254d is even more stringent than the Teague analysis. I also don't believe that the Eighth Amendment claim that they're raising here is actually true. Why is it that after the Supreme Court ruled that if someone is, the term used to be mentally retarded, that people could raise that claim after Atkins, even though Atkins was decided after all of these courts had ruled. Atkins was applied and people were allowed to be declared ineligible for the death penalty based on Atkins. I think in those situations, Your Honor, those individuals were permitted to file a second or successive petition and that this court cleared that on authorization. So if the Supreme Court were to ultimately decide that the mentally ill could not be executed, that would be the course for relief in this situation, but not to review the state court decision here and find it unreasonable based on interpretations of the law. You're saying it'd be a relief from execution, not really a relief from the judgment. Is that your argument? Or I'm trying to understand what you're saying, what your distinction is. Well, I think if the Supreme Court determined that the mentally ill couldn't be executed, the only relief would be from execution, not from judgment. What's the judgment of execution? The sentence, Your Honor. That would be where relief would occur, but in this particular instance, because of when this particular decision was rendered, the only way that that could occur is if they filed a second or successive petition. I don't believe that this court can consider the law that has developed post the relevant state court decision. Well, I think in Atkins, we sent most of these, we stayed our case and sent most of these back for them to go to the state court first, because one thing in this case is we don't actually know if Smith is mentally ill. We're sort of assuming that arguendo for purposes of this exchange, but there's a big debate about whether he actually does have schizophrenia, right? I would disagree with that, Your Honor, because the state habeas court found that he did not have schizophrenia, and as a result of that, that's a presumed correct fact finding, and there's nothing in this record. Would that be a second answer to the Madison question? That because they found him, well, when I say big debate, they're still disagreeing. They still think he has it. They think the ineffectiveness of counsel is why, you know, that wasn't brought up and so on and so forth, and I know the state habeas looked at that, but your argument would be, well, you would have to give deference to the fact finding of the state habeas court, and so even if the Supreme Court said we can go back and kind of undo execution judgments based on this mentally ill issue, he's not mentally ill. Yes, Your Honor. Or at least not mentally ill enough. Yes, Your Honor, and that is a problem with their claim, is that they haven't really defined what seriously mentally ill is. We don't know whether it includes schizophrenia. We don't know whether it includes, for example, in my brief, an individual with ADHD who is substantially impaired and being able to count money. There is no clear definition of what they mean by seriously mentally ill here, which is another reason why the state court's decision was reasonable. They have not provided sufficient guidance to even show who would be categorically exempt or what that classification would be. I mean, you can treat schizophrenia. It isn't always successful, but it is in many instances successful, so that's different from intellectual disability or what used to be called mental retardation, where there really isn't a treatment. You can certainly educate and work with people that have limited mental skills, but it's different from a psychiatric disorder. It is, Your Honor, and in fact, in this case, one of the reasons why it appears that he is not schizophrenic is because despite having no treatment, whether that is through face-to-face interaction with a mental health expert or through medication, this individual does not have symptoms of schizophrenia, and that is not something that is generally seen in schizophrenia. It gets worse. It doesn't just resolve by itself. Although it can be episodic. It can absolutely be episodic, but if we look at what they're relying upon in this particular case, it's a few months from late 95 to early 96 where he was not adjusting well to prison and was, according to TDCJ personnel, he was either malingering or he was having an adjustment disorder or he was having a religious disorder. So, in that instance, there are other diagnoses here that contradict schizophrenia, and that short period of time is then followed with several more years in prison without indication that he is suffering from those symptoms. So, if it was even episodic, there is a slew of people observing him for a five or six-year period where they don't observe this, except for that one brief moment when he initially goes into prison, and we don't see those in the records from the state jail when he went a couple years later, and we don't see those from when he was in Harris County awaiting this particular trial. All right. Let me ask you back on the question of Mr. Stringer. Yes, Your Honor. It seems concerning to me that the judge used the exact language that Witherspoon had concern about, you know, the conscientious objector question. How are we supposed to, you know, look past that? I understand that pedeference. I get that very well, but it does seem odd that decades after Witherspoon, the judge is still using language that Witherspoon said mixed, let's say. I have several responses to that, Your Honor. First, I believe where you are obtaining the language that was found to be problematic in Witherspoon is located within footnotes 9 and 21. 9 and 21 have been explicitly determined by the Supreme Court to be dicta, and the only thing that can be considered for purposes of 2254d are the actual holdings of the Supreme Court, and when I say that 9 and 21 have been explicitly held to be dicta, that occurs in wit. In addition, I... Right, but I think that while Witherspoon has certainly evolved, I will agree with you on that, um, I, they have not gotten past the notion that somebody can be opposed to the death penalty, be a conscientious objector, have concerns about it, and still serve because they can put that aside and apply the law. Now, you may still want to use a peremptory challenge on that person, I get that, but as far as a challenge for cause. And that is the basic holding of Witherspoon, which I think still survives, but the determination that those questions were inadequate does not survive. Those determinations were made in those two particular footnotes, 9 and 21, which wit held were explicit, or explicitly held that those were dicta, and also the, the analysis of those claims, or I'm sorry, those questions being inadequate was under a standard that is rejected in wit. Uh, in Witherspoon, the question was, would you always vote for life, or would it affect your ability to judge guilt? That's not the relevant question here. The relevant question is whether the, the question getting too substantial impairment, uh, can leave the trial judge with a definite impression that the individual could not faithfully and impartially apply the law. Well, the stringer's checked by the box on this question in the affirmative. I would consider all of the penalties provided by law and the facts and circumstances of the particular case. He did, Your Honor. Uh, and then he answered to the trial judge that he did have moral and conscientious opposition to imposition of the death penalty in an appropriate case, and an appropriate case was explained by the trial judge in the panel vor dire, uh, that they had to answer those questions wherever they lead. So even if we were to look at that particular part of the questionnaire, that simply shows disagreement. But why couldn't appropriate case be a case where you don't think he should get the death penalty because he had been abused as a child, and he felt remorse, and things like that? I mean, why isn't that the appropriate case that I can't vote for the death penalty where I feel like this guy had a terrible life and so on and so forth? That's different from saying I can never or, you know, um, I just refuse to follow the court's instructions. Because we do allow jurors to consider mitigating circumstances. That's a big, huge part of the whole, uh, sentencing process in a death penalty case. So absolutely, that would be an appropriate case to not think the death I mean, I'm not taking that position. I'm just saying that's, that's something that's a position a juror could take and not be violating the instructions of the court. I agree, Your Honor. I think the analysis here, though, is what the trial judge or whether the trial judge could have reasonably interpreted that answer as being opposition to the imposition of the death penalty in an appropriate case. And here they were asked, could you think of an appropriate case essentially where you would impose the death penalty? And these individuals said that they had moral or conscientious or religious opposition to doing that even in an appropriate case. You know, I think Cruz presents a good contrast to Stringer because I, I think the appeal on Cruz is somewhat questionable. Uh, but Stringer over and over again checks boxes about how he does believe in capital punishment. And this page that mysteriously got excluded is, is replete with that. Capital punishment is absolutely justified. He agrees. I think capital punishment is necessary, but I wish it were not. He agrees. Any person, man or woman, young or old, who commits murder should pay with his own life. He agrees. So if we're going to rely on the questionnaire, we must have capital punishment for some crime. Agrees. I mean, that's, if we're going to consider the questionnaire, that's, that sounds like somebody who can certainly grant the death penalty where, in an appropriate case, to use your framing of that phrase. Uh, I think that's absolutely accurate, Your Honor. However, if you look further in the questionnaire, he says that if this is a murder case, I could not serve. But that's because he says death makes him uncomfortable. But who's death? Katrina and the death penalty for Smith. I mean, he doesn't want to hear about this lady and her daughter getting shot. I don't see how being uncomfortable about death, because he says if this is a murder case. Well, he doesn't know. We know that you can't get the death penalty for anything other than murder. But that wasn't true until, you know, fairly recently. And I wouldn't expect an ordinary person necessarily know that. So that doesn't seem to be commenting on the death penalty. I think it could be either or, Your Honor. But that's why the trial court, best positioned to observe these answers, was able to make that call. In fact, the state judge recognized that there are, quote, people, there are some people who, quote, believe in the death penalty, but could never be a participant when that person is, or ultimately could get the death penalty. So there is a difference between an individual who is in of the death penalty hypothetically, or if somebody else were to make the decision about whether the individual were to get the death penalty, but who they themselves could not actually impose it. And I think the trial judge here made that appropriate distinction. In fact, in Ortiz, this court found reasonable a state court decision where the individual was challenged, uh, and the CCA said that of an IR member who couldn't impose, even if they hypothetically believed in the death penalty, or somebody else believed in the death penalty, or was making that vote, could impose a death penalty. So there's a distinction there about whether the individual could actually serve, and whether they have a hypothetical belief in the death penalty. And I think this state trial judge here recognized that appropriately. I'm sorry. I said the daughter's name wrong. It's Christina. I apologize. It is your honor. Uh, again, in addition to the questionnaires, um, and Stringer's questionnaire is that, um, again, he couldn't serve because the talk of death makes him uncomfortable. One of the, um, definitions for being, uh, an appropriate juror is that you'd be able to faithfully and impartially apply the law. If he says he cannot be a juror, then he can't even start at square one where he's applying the law, let alone impartially or faithfully. With respect to both of the IR members. Somebody says I can't be a juror because if I take off four weeks from work, I won't get paid, and my family will starve. And then you strike, and then that person stays on the jury. Is that somebody who wasn't capable of being a juror because they said they couldn't be? It's the trial court's decision to find out or, or, um, it's their role to determine whether the, the financial hardship or the psychological hardship would be so much that they couldn't pay attention to the evidence, that they couldn't apply the law. And here the trial judge thought that the non-responsive answers, that his demeanor, uh, that his answer in the juror questionnaire was sufficient that he could not even, again, start at square one and, and apply the law if there was the talk of death. Uh, so again, it is the... The juror's own self-strike coupled with the judge's determination of that, that's it. We're done. We, we don't have any role in reviewing that. You have a role in reviewing that, Your Honor. It's just that it's not unreasonable if a appellate court or a state appellate court upholds that. Uh, and so here again, there are these five bases for Matthew Stringer. His questionnaire, I have mentioned his demeanor, but this is particularly important with respect to him, where the trial judge stated, I noticed you the other day, I noticed that you were paying attention. In two other instances where the trial judge made that comment, those jurors were found to be substantially impaired. There were another two instances where they weren't. They were accepted as, as alternate jurors, but that's a decision that should be left to the trial judge to make, and the trial judge made that decision here. In addition, defense counsel's lack of rehabilitation is also something that the trial court could have considered. Defense counsel rehabilitated, or not rehabilitated, but attempted to rehabilitate, five other Venire members. Here, he didn't even try, nor did he try with Patricia Cruz. That is something the trial court could take into account, that these objections were preservation only, not true indications that this individual was not substantially impaired. And again, with the appropriate case question, the way that I have framed that, the religious, moral, or conscientious objections to the imposition of death penalty in an appropriate case, that itself is sufficient for a finding of substantial impairment here. The trial judge, before asking that question, hearkened back to the panel Venire by stating that, obviously, this is a very important case with a very serious punishment. If you find the defendant guilty of capital murder, and if you answer these questions in the particular way that I explained. Taking into context the, the preface to the appropriate case question, the fact that there was extensive discussion about what a legally appropriate case would be, no fair, or it is beyond, it is not beyond fair-minded debate as to what that question was getting at. In essence, it was telling him what the range of punishment was in this case, either 40 years flat or a death sentence, and then asking him whether essentially he could pose, impose a death sentence under the applicable law, and he said no, that he had a, a moral and conscientious opposition to that. Cruz said that she had a religious and conscientious opposition to that, and her questionnaire is undoubtedly substantial impairment. I honestly don't know if I could sit in judgment of another person if it resulted ultimately in his death. That is pretty much tantamount to the finding in V. Wheeler that the juror's confirmation that he was not absolutely certain if it, that he could realistically consider the death penalty was a reasonable basis for finding that individual to be substantially impaired. She also stated that she was opposed to the capital punishment under any circumstances, which is clearly under Adams v. Texas, substantial impairment. May it please the Court, I'd like to begin with two concessions. Concession number one is that we are no longer pressing before this Court the issue that it was error for the Court below to determine that the State Court's ruling on juror Cruz did not comply, that it was not, that it was objectively unreasonable, and so I'm no longer pressing the issue of juror Cruz before this Court. Number two. Anything about Cruz at all? I'm going to discuss, Judge, I'm going to discuss. You're not using the removal of Cruz from the venire as a basis for relief? Correct, Judge Owen. I'm going to discuss, Judge, I'm sorry, I'm going to discuss juror Cruz momentarily below to follow up on a point that Judge Haynes made dealing with the contrast between potential juror Cruz and number two, I am also going to concede before this Court that we do not have any evidence that the juror questionnaires were not before the trial court, that they were not consulted. I assume that judges read briefs that are filed, so I'm not sure that it's analogous to the point that were not consulted, and so I'm also conceding the relevance of those questionnaires, and I'm going to return in particular to potential juror Stringer's questionnaire because of the contrast in which it stands with the juror questionnaire that was considered by this Court in Gomez. So that's the second concession. The third issue that I'd like to raise that is not included in the briefs, and I apologize to the Court for raising an issue that is not included in the briefs, and obviously, we are prepared to brief this issue if the Court so requests. The only reason I'm raising it now — Why are you raising it now? Because it didn't occur to me until Friday, Judge Clement, and I believe that it goes to the question of whether this Court has subject matter jurisdiction over this appeal, and I think that it's always appropriate to raise a question of subject matter jurisdiction. But you mean last Friday? You have until today to file a 28J letter or something to alert the Court? It would be an argument, Judge Clement. You're dropping two major issues, and you're adding another one? I don't think that's appropriate. I'm not sure that it's — I'm simply conceding that I'm no longer pressing the question of whether potential juror Cruz was not qualified, and I think that it's appropriate for me to concede that in view of the government's brief. And similarly, I'm conceding that the — Which was filed a long time ago, the government's brief. You're coming to court today and doing this, which is not fair to opposing counsel. It's not fair to the Court because we're prepared to address what's presented to us in the briefs. Okay? I understand. I understand, Judge Clement. I simply did not want to spend my time answering questions about the merits of those two issues. And if the Court had asked me questions about the merits of those two issues, I would have been disingenuous in arguing in support of those two issues, which I am persuaded we are incorrect about. Okay. Why don't we have subject matter jurisdiction? Because, Judge Haynes, 2253 requires a certificate of appealability before the Court has jurisdiction over — That's not true on — under Jennings v. Stevens. That provides that the government is not required to obtain a COA. However, the Rules Enabling Act, and then Gonzalez v. Crosby, the Supreme Court holds that the COA requirement is jurisdictional. Yeah, but, I mean, I was on the panel on Jennings, and I remember very clearly Jennings received relief from the District Court on point A. Yes. And wanted to raise point B before us — Yes. — after the State appealed, and we said, no, you can't do that, you need a COA. And the Supreme Court said, wrong, and sent it back. So I like to learn at least from cases where I'm reversed. Because, as I understand Jennings, Judge Haynes, the party that seeks the COA on a particular issue is permitted to defend the judgment on any issue that was presented to the District Court, even if it did not receive a COA on that issue. Right. But the party seeking relief has to obtain a COA. And in this case, the party seeking relief is the government. There is no COA that the government has sought. Oh, the government doesn't need a COA. Correct. No, no, Judge, this is why I'm raising this jurisdictional issue. Federal Rule of Appellate Procedure 20 purports to carve out the government from seeking a COA. However, however, the Supreme Court of the United States has held that insofar as the rules purport to expand or constrict the jurisdiction of a court, the rule is ineffective to that extent. Gonzales against Crosby, in turn, holds that the COA requirement is jurisdictional. Why does Jennings not say, oops, wait a minute, sorry, you, the State, because the State didn't get a COA in that case either. Because the — because the appellee never needs — But the Supreme Court has to raise subject matter jurisdiction on its own, too. Right, and I think what the court — We have to figure they know what they're doing. I think what the court held in that case is that the party seeking relief obtained a COA. The other party can defend the judgment on any grounds. And similarly, the party that — That's not what happened in Jennings. The district court granted relief. The State appealed. And then the Jennings wanted to raise some new stuff, and we said, you can't do that. And that went up there, and the Supreme Court never said, whoa, wait a minute, this circuit never had jurisdiction. I understand. The issue is not presented. I mean, the issue — the issue of whether the — and I'm prepared to move on. I think that'd be good. Tell me about Crosby. I'm sorry? You're making an argument about Crosby. You were about to say something in Crosby prevents us from exercising subject matter — Because Gonzales against Crosby holds that the COA requirement is jurisdictional. As to the government? Doesn't say as to the government. It's very uncommon for the government to be in the position of an appellant. This is, I think, only the second time that I've sat at the appellee table in a death penalty case in this court. It's uncommon. It's not an issue that I had spent a lot of time thinking about, frankly, and so I apologize to Judge Clement that I didn't think about it sooner. I will return now, with the indulgence of the Court, to the question — So, if we were to agree with you, what happens? I think — thank you, Judge Owen — I think that you can treat the government's notice of appeal as a request for COA. And I think that the COA standard would be exactly the same as when an inmate is seeking a COA, which is to say whether the district court's ruling in this case that the state court's resolution of the Witherspoon claim is objectively unreasonable is itself a question on which reasonable jurists could disagree. So, it's a technical matter. We should reach the issue anyway. It's just how we get there. I think that if the Court wants to reach the merits, that's what it has to do, but I think that in order to create subject matter jurisdiction, the Court has to treat the government's notice of appeal as a request for a COA. And if we do so, we should — you think we have the authority to address the merits? If you do so, I think that you should find that the COA standard is not met. I get that. I'm just saying we have the — okay. Yes. And I think that if the question were whether the government satisfies the COA standard, the answer would be no. And I'd like to start with two issues — or with two issues that Mr. Ottaway started discussing and that he also raises several times in his brief. He frequently defends the decision to get rid of any juror, potential juror, stringer in particular, on the basis that the trial court is left with a definite impression. It simply cannot be the case that if a trial court is left with a definite impression, that that automatically insulates the decision to exclude a juror simply because the trial court had that impression. That would eviscerate the holding of Witherspoon. It would eviscerate the holding of Adams. The trial court could simply say, I have the impression that this person is incapable of following the law. And that would insulate the removal of that juror, and that would have the effect of making Witherspoon and Adams completely meaningless. In your brief, you completely breezed past White, which says where there's ambiguity. I agree. If there was just — let's say Stringer just never said anything. Yes. And they go, I looked at him, and he kept frowning every time the death penalty was made, so I, the judge, have decided he don't like the death penalty. I'm striking him. Something that off the wall. Okay? In that situation, of course, I think that would be something that would be unreasonable to sustain. But here, where there is ambiguity, why isn't the White holding that in ambiguity we defer to what I've always called Johnny or Jane on the spot, the judge who's sitting there looking you in the eye and sees which — how you're acting? The reason — the reason, Judge Haynes, is that there's simply no ambiguity here. What — what Stringer says repeatedly, time and again, over and over, does not satisfy the Witherspoon exclusion standard. The colloquy between Stringer and the Court occurs at pages 3791 to 3801 of the ROA. And the question that the trial court says is, do you have any moral, religious, or conscientious objection to the imposition of death in an appropriate capital murder case? Stringer says, death bothers me a little bit. It makes me uncomfortable talking about it. But other than that, that is not a yes, that is not a maybe, that is not a sometimes. The Court then asks a question that lasts an entire page in the reporter's transcript, at the end of which the Court says, obviously, there are people who feel all types of ways, but how do you feel? You're telling me that you feel uncomfortable with death. What does that mean? Mr. Stringer says, anything about it, pretty much. He feels uncomfortable with death. I feel uncomfortable with death. I suspect that it's the case that many jurors feel uncomfortable with death. That is not the relevant question for Witherspoon. It's not the relevant question under Witt. It's not the relevant question under Adams. Then the Court says, so when you say anything about it, and then he goes all the way down, and we're about to get to the part of the colloquy between the trial court and Mr. Stringer that the government relies on entirely and that the Texas Court of Criminal Appeals relied on exclusively in this case. The Court says, so let me ask you this question again, and you have to say yes or no. Not, I think, maybe you know that kind of thing. We need to know precisely, yes, you can or no, you can't. Now, I think that the only fair reading of that question, and I'm about to return to what the trial court continues on in just a moment, I think the only fair reading of that question, yes, you can or no, you can't, is could you return a sentence of death if this is a death penalty case? And what is Mr. Stringer's answer to that? His answer is yes. Now, the reason that there is confusion, I think, is because the next part of the trial court's interjection here, which comes after the question, muddies the waters. The trial court then says, okay, how do you feel? Do you have any objections, any moral, conscientious, or religious objections to the imposition of death penalty in an appropriate capital murder case? And he says, yes, that means that there's some case where I would not return a death sentence. It does mean I could not return a death sentence in an appropriate case, and that is the question that has to be asked. That is the question that the trial court asks potential juror Cruz. The trial court says to juror Cruz, this is in the record on appeal at 3972 to 3974, all right, do you have any moral, religious, or conscientious objections to the imposition of the death penalty? In other words, are you against the death penalty? And she says, yes, I am. The difference between the — between what the Court asks juror Cruz and what the Court asks juror Stringer is that juror Cruz's answer is clear, and their clear answer is, I could not do this, and juror Stringer's answer is clear, which is that he could not — that he could return a sentence of death, even though there might be some case where he couldn't. I don't think there's any ambiguity. If there were — if there were ambiguity, Judge Haynes, then let's ask how we might clarify that ambiguity. And we would look at the questionnaire that you were looking at, Judge Haynes, and the relevant questions, and then we would think about how the answers to the questionnaire square with other decisions of this Court that have addressed the question of whether a potential juror is substantially impaired. Question number one of Mr. Stringer's questionnaire, do you have any religious, moral, or ethical considerations that would prevent you from sitting in judgment of another person? Answer, no. Question number two, what are your feelings about the death penalty? Please explain, Mr. Stringer's answer. It's good that we have it and should be used on the worst of crimes. Question number 94. Check one statement which best summarizes your general views about capital punishment. He checks. I am neither generally opposed nor generally in favor of capital punishment. You know, he then contradicts that. I don't think he does, Judge. You're going to — you're going to — He's saying he's in favor of it. And then his answer to her, because even if he misunderstood what he was saying yes to the first time around, she follows up by saying, okay, what is it, religious, moral, or conscientious, and then he says — so if he had been confused that maybe he was answering yes to can you assess the death penalty, he would at that point then go, oh, wait a minute, wait a minute, no. He instead said moral and conscientious, which is inconsistent with his rah-rah for the death penalty in answer to question 96. I don't — I don't think that that is a fair reading of his answer, Judge Haynes, in view of all of — in view of the totality of evidence that we have in this case. His objection to a death penalty in a particular case is moral and religious. So to use your example, if we had a 16-year-old kid, he would object to the imposition of the death penalty in that — in that case on both moral and religious grounds. If we had somebody who's intellectually disabled, he might object to that. Well, it could be read — it seems to me the more natural reading of the question that the judge finally put to him was, do you have any objections, any moral or conscientious or religious objections, to the imposition of the death penalty in an appropriate case, meaning most people would think that the death penalty would be appropriate in this — in a capital murder case. And he says, yes, even — even when it's appropriate, I have objections. I — I — Best, it's ambiguous. That's — I think that has — that's the more natural reading of it than yours. I — I think, Judge Owen, that — that that is simply not a fair reading of the colloquy. And as — as — as you all know, what's happening here is that the judge is asking questions, and Mr. Stringer is answering, and the judge's questions are pretty long. They're not yes or no's the way he asks Judge Cruz. He has these long wind-ups and lots of subordinate clauses. And I simply think that in view of the nature of the questions, it's not remotely plausible to read Stringer's answer as reflecting substantial impairment. There are two cases, as best as I can find, that address the question of what substantial impairment means. One of them is from this Court. One of them is a — is a Third Circuit case. The Third Circuit case is called Martini v. Hendricks. It's 348 F. 3rd, 360. And the case is not particularly useful to this Court, given the facts in this case, other than that the Third Circuit in that case, I think, makes a useful distinction between impairment and substantial impairment. And what the government is arguing in this case is that the fact that potential juror Stringer is bothered by death, that that represents a substantial impairment. And there's no authority whatsoever for the proposition that being bothered by death is a substantial impairment. Is there authority to the contrary? Well, I think only by negative implication, Judge Haynes. The other case that we've located that is cited in — in our — our — our brief at page 37 is the decision in Gomez. And what this Court does in Gomez at 529 F. 3rd, 322 is the page that the case starts on, and I can't immediately find the jump site in front of me, but the Court goes through this questionnaire, because the juror in Gomez is somebody named Campos, and the Court goes through the questionnaire and points out Campos's answer. So if we look back at Stringer's questionnaire, question number 96-8 is, capital punishment has never been effective in preventing crime. Stringer says, I disagree. The juror here in Gomez, she agrees. Question number 12, I do not believe in capital punishment under any circumstances. Potential juror Stringer disagrees. The juror in Gomez, she agrees. I thought Stringer also said, I think, a life sentence is more appropriate than a death sentence. He said — he — he — in some cases, it is, but he also says we must have capital punishment for certain crimes. He's kind of all over the map as I read through these. It's a little here, a little there. I would just say, Judge Owen, that if you look at the answers that juror Stringer or potential juror Stringer gives to question 96 on the agree-disagree, I — I simply resist the characterization that he's all over the map. He's not all over the map at all. This is somebody who unequivocally, unquestionably says that he could return a sentence of death. Is it possible, as Judge Haynes is suggesting, that in — in some case, he's against it? Absolutely. But that's not the test. The test is whether he is substantially impaired, where substantially impaired means he cannot follow the court's instructions. And what the court's instructions in this case are going to be, given that it's a death penalty case, are do you find that the defendant is a future danger, and there is no reason to think that he can't answer that question? But is it unreasonable for the trial court to have found that he is all over the map? I think — I mean, I can see — again, like, if this were a direct appeal, you know, I'm in a different — like, I've got a different hat on. The hat I have on here is one that really constricts my head, okay? And so I'm having to look, like, did the trial court act unreasonably, to just sum up all those standards that we deal with under EBPA? And you know, it does seem like he's giving some inconsistent answers, his verbal answer. And again, we don't have the benefit of looking him in the eye. And while I didn't do capital cases as a trial judge, I did a lot of ordires as a trial judge. And I remember some jurors were, you know, looking us in the eye and answering, and some of them were sweaty and, you know, seemed to be a little bit not totally forthcoming with us and so on. And that's something I have to gauge. As the trial judge sitting there looking at him, I could gauge that incorrectly. Maybe they're just sweaty people, you know? Maybe the person's just a good liar or whatever. And I would say most jurors I did not think were lying to me, to be fair to the jurors that appeared in my court. But whatever the situation, there were people that were more uncomfortable or less uncomfortable answering questions, and I had to filter all of that. And that really wasn't for some appellate court later to go, well, you know, because they weren't there. Right. And I would just say two things about that, Judge Haynes. Thing number one is that there has to be something in the record besides the trial judge's entirely eviscerates Witherspoon. It simply can't be the case that it is adequate to strike a juror just because the trial court says I've got some problems with this juror. There has to be something else. And in this regard — No, and I get that, but I mean, what if the — and I know this is a little bit off topic, but I remember doing a voir dire as a lawyer once, and there was a juror who just spent the entire time yawning every time I talked and then smiled real big when my opponent talked. Okay. There's no record of that. And so if there had been some sort of Batson challenge or something like that, I don't even remember the situation with that juror, but, I mean, that was the basis for my — and I wouldn't have any record of that. So if there had been — I don't — again, I'm not saying that you could have made a Batson challenge. I just am saying that's the sort of thing that happens in real time. Any lawyer would strike a juror who's yawning at them and smiling at their opponent, but you don't have much of a record of that. So while I agree that just the judge saying, I just don't think Mr. Stringer can be fair is probably not good enough, that coupled with the other things we have here, which is the seeming inconsistency between his answer to the question about the conscientious objection and his somewhat gung-ho support of the death penalty in the questionnaire, that is a supplement that we have to give some credence to, right? I don't think that there is any aspect of Mr. Stringer's demeanor that is reflected in the record other than the trial court saying, I noticed you earlier. It doesn't say what about Stringer was noticed. It just says, I noticed you. And — But then, I mean, who's supposed to draw that out? I realize that on direct appeal, the state would have had the burden. But here we are, you know, three reviews removed from that. And it's now your burden to show that he wasn't, you know, frowning or — I mean, there are definitely jurors who sit there on the voir dire panel and are reacting hugely without saying anything. They're frowning or they're jumping around or they're smiling or, in my case, the yawning or whatever. And as a judge, hopefully you are observing that kind of thing. Yes. It's my burden to show that the decision of the Court of Criminal Appeals was objectively unreasonable under this record. The Supreme Court in Utecht v. Brown requires that the record itself — that the record itself show substantial impairment. The burden is on the government at the trial to demonstrate that substantial impairment. When this case goes to the Court of Criminal Appeals on direct review, the Court of Criminal Appeals says that it is clear that Stringer's personal feelings against capital punishment would prevent or substantially impair the performance of his duties as a juror. That's — the Court of Criminal Appeals spends an entirety of one sentence on the merits of the Witherspoon challenge to the removal of Stringer. The question before the court below was whether this finding, given the record in this case, is objectively unreasonable. So you're saying we can't even look at the trial judge's impression because the TCCA didn't expressly mention it? I know that you didn't write Gillers v. Van Noye, Judge Haynes, but you were on the panel in Gillers v. Van Noye, in which I believe is the first case where this court interprets the Supreme Court's decision in Wilson v. Sellers. And — All right. Is that the argument you're making? And the answer is that the question of whether the decision to remove Stringer is objectively unreasonable is determined by looking to the decision of the Court of Criminal Appeals. And what the Court of Criminal Appeals does in this case is say he was against the death penalty. And that decision, given the record in this case, is objectively unreasonable. It simply does not show substantial impairment. And even — even if I were to concede something about Stringer, and I'm not inclined to concede anything about him because I think that the questionnaire is unambiguous and that the only reason that it's possible for the government to make hay out of his answer to the trial court's questions to him during individualized voir dire is because those questions are so difficult to follow. If I were going to concede anything, I would concede that he is impaired in a particular case, but that he is not substantially impaired with respect to his ability ever to return a sentence of death. And that is what the government's burden is in order to satisfy the Witherspoon excludability of a potential juror. I don't have a lot of time left, but I'd like to return in my remaining time to the question of Mr. Smith's substantial mental illness. And I would just like to make, I think, a couple of points. The first is in response to the government's suggestion in this case that we do not provide a definition of severe mental illness. That is not, in fact, true. A footnote, 21 of our federal habeas petition that was before the court below provides the definition of substantial mental illness that we argue. What clearly established law did Texas courts fail to apply? I think that the question of whether somebody who has severe mental illness is categorically excluded from a death sentence is now a question that can be answered by... Has the Supreme Court, what the Supreme Court's told us, we're the Fifth Circuit, not the Supreme Court, but the Supreme Court said you cannot execute someone when they're substantially mentally ill. It hasn't said that, but we believe that that conclusion... We can't draw that conclusion. That much is clear to us, I think. We concede that. This court cannot draw that conclusion on habeas. Henceforth, this is the established law. I think, Judge Owen, that if this panel addresses the severe mental illness question in that way, then it will be answering that question in a way that is different from the way that the court below answered it. All that the court below said was the TIG bar. We're not bound by the federal district court. I understand. What is your take on Madison v. Alabama? What, if any, impact could that opinion, if it came out tomorrow, have, assuming they stick to the issue presented in that case, how could it impact this case, if at all? I think it's a question of how narrowly or broadly they write, Judge Haynes. If they write very narrowly, that somebody is... If they make it... If they write narrowly and they make it a case that's very much like Ford v. Wainwright, it's just another little subset of Ford v. Wainwright, and all that's impermissible is to carry out the execution, and it's, of course, quite possible that during the duration on death row, the inmate would once again acquire an awareness and would then again be subject to execution. But it wouldn't be currently, at least. It would not be currently. On the other hand, if... If they said broadly, then what is your response to the exchange we had with Mr. Ottaway about whether that would apply, you know, under Shoup or whether it would be more of a categorical denial of execution, so it would be more like Atkins? I think that it would be a categorical exclusion. It would create an other universe of defendants who are ineligible for execution under the agreement. But not ineligible for all time, a la Panetti. That's why it goes to the question, Judge Owen, of whether the Supreme Court addresses the question broadly or narrowly. If it's addressing the question broadly, then it would hold that somebody who has this form of severe mental illness at some point in the proceeding is ineligible for execution. Ever. That's your point. Ever. Well, I recognize the point that you were making, Judge Haynes, about how some mental illness is treatable so that somebody who perhaps lacks some cognitive awareness at some point in time can then acquire that cognitive awareness later on, and I'm not prepared to say how that would affect Mr. Smith's case. What about the fact that the State court found the opposite, that he does not have schizophrenia? I don't think every potential mental illness is going to keep you. I don't think they're going to go that broad. But if they were to say severe psychosis such as schizophrenia, they found he didn't have it, so would we then be bound by that? No. We argued in the court below that that finding is not supported by the record and it's contradicted by clear and convincing evidence. Thank you.  Addressing the subject matter argument that has been raised for the first time at oral argument, 2251, which controls the COA, is applicable only to applicants. It is not applicable to the government. It is explicitly found not to be applicable to the government in the Federal Rules of Appellate procedure. That's why we don't need to seek a COA. So any attempt to try and prevent this court from reaching the issues that could potentially sustain the grant of relief here is not persuasive. I think given that Jennings, the Supreme Court, found jurisdiction to hear the case in general, but also specifically given that the State had appealed without a COA and given that the Supreme Court overlooked this ginormous of a subject matter jurisdiction, I think I agree. Sometimes you could miss a question because it wasn't raised. That just seems to me to be inconsistent with Jennings. I agree, Judge Haynes. I think that this particular case is on all fours with Jennings. There is nothing that prevents this court from reaching the other two arguments that they believe sustain the lower court's grant of sentencing relief, and the court should find that those do not sustain the lower court's grant of relief. With respect to the argument that definite impression is impermissible, that is the standard imposed by the Supreme Court in wit. And How do you intersect the argument of, under Wilson at SEC, we are limited to the ruling of the TCCA with this notion of, you know, there is a lot of deference to the trial court's conclusions in these cases and so forth? How do we glom all that together? Because to be fair to the TCCA, they had about ten jurors who were challenged on this ground, and they are kind of going point by point. I don't know that each time they have to say, and we bless the trial judge. I mean, I think if they are going to overrule the trial judge, they might get into kind of limiting the trial judge. But I think, isn't it sort of known that you do tend to defer to Johnny or Jane on the spot for things that involve credibility and so forth? And that's kind of a fundamental premise of appellate law, though not always followed by appellate courts. I get that, as a former trial judge. I have several responses to that, Your Honor. Okay. First, Wilson v. Sellers is raised for the first time during this argument to the extent that it is a limitation on reviewing the CCA. I believe that argument has been waived. But second, the CCA noted the general law that the trial judge is in the place, the Johnny on the spot or Jane on the spot, to observe demeanor. So simply by the CCA saying that they defer to demeanor calls is itself a finding by the CCA that they will defer to them. They don't have to say it about each one of these ten or however many jurors there were that were challenged is I guess what I'm saying. Because, you know, it is a little bit succinct what they say about Stringer, but you have to read it in the context if they just waded through a half a dozen other people at that point. Correct, Your Honor. In fact, I would point you to White v. Wheeler, where the underlying Kentucky state court decision doesn't even talk about demeanor. It just says that we find no abuse of discretion with respect to all of the individuals who they are appealing on for Witherspoon error. So there's no mention of demeanor there, yet in White v. Wheeler the Supreme Court mentions demeanor being of critical importance. And again, with respect to the definite impression, the argument that that has somehow overruled Witherspoon, the Supreme Court in Witt specifically noted that there has to be deference to the judgment of an individual, and there has to be deference to the judgment of an individual in order to integrate the importance of an impartial juror. We reiterate what this Court stressed in Dennis v. United States. The trial court has a serious duty to determine the question of actual bias and a broad discretion in its rulings on challenges, therefore, in exercising its discretion. The trial court must be zealous to protect the rights of an accused. That happened here, and that is not an overruling of Witherspoon. It's a recognition of the appropriate place for a trial judge to make these types of difficult calls, and that was made here. Mere disagreement with that does not overcome an initial layer of deference on direct appeal, and it certainly doesn't overcome the double deference that is accorded state court decisions under 2254D. With respect to my opposing counsel's argument regarding how to interpret the colloquy between the trial court and Matthew Stringer, in order for this court to grant relief, it would have to find that no fair-minded jurist could possibly interpret it in the way that the government has proposed here today, and that it takes into context the fact that it's asking about an appropriate capital murder case, which was defined— So it would have to be almost like, as a matter of law, that's what this means, or something like that, rather than just one could construe it. I mean, it's possible that Mr. Stringer misunderstood the question, but that isn't the standard, is what you're saying. That is correct, Your Honor. In fact, Witt explicitly says that. The confusion with how a juror might answer a particular question is not how we review these cases. They're reviewed based on whether the record supports the possible interpretation of that answer, and giving deference to the trial court in determining exactly how that question has been answered. And here, the trial judge specifically noted that it was difficult to serve as a jury, and that this was a difficult case because there was death involved. But the trial judge appropriately noted that, again, we don't want you as a juror in this case if you don't want anything to do with death, because obviously you would have to. You'd have to do that in both guilt and innocence in this case, and you would have to do it as punishment, whether it's hearing. That's not even really a Witherspoon issue, though. If he just can't sit through a murder case because listening to death is just too much for him, even if it was not a death penalty case, that would be a problem, is really your argument. It would be a problem, Your Honor. And again, in the Supreme Court language, it's whether they can apply the law. But if they can't even get to applying the law, that's the problem. That's where the trial court can determine that they couldn't sit as a juror. And I would ask the Court to please reverse the lower court's grant of sentencing relief and otherwise enter judgment in the Director's favor. This case is under submission. Thank you.